UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARISSA V.[1], | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00470-SEB-DLP |
| | ) | |
| ANDREW M. SAUL, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Larissa V. requests judicial review of the denial by the

Commissioner of the Social Security Administration ("Commissioner") of her

application for Social Security Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 423(d), 1383(c)(3).

On June 22, 2020, United States District Judge Sarah Evans Barker entered

an Order referring this matter to the Undersigned for a report and recommendation

regarding the appropriate disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Dkt.

15). For the reasons set forth below, the Undersigned recommends that the

Commissioner's decision denying the Plaintiff benefits be **AFFIRMED**.

---

[1] In an effort to protect the privacy interests of claimants for Social Security benefits, the Southern District of Indiana has adopted the recommendations put forth by the Court Administration and Case Management Committee of the Administrative Office of the United States Courts regarding the practice of using only the first name and last initial of any non-government parties in Social Security opinions. The Undersigned has elected to implement that practice in this Report and Recommendation.

# I.    PROCEDURAL HISTORY

On March 23, 2016, Larissa filed her application for Title II DIB benefits. (Dkt. 13-2 at 69, R. 69). Larissa alleged disability resulting from postural orthostatic tachycardia syndrome, idiopathic hypersomnia without long sleep time, fibromyalgia, benign essential hypertension, and dizziness. (Dkt. 13-2 at 69, 83, R. 69, 83). The Social Security Administration ("SSA") denied Larissa's claim initially on July 18, 2016, (Dkt. 13-2 at 81, R. 81), and on reconsideration on November 4, 2016. (Id. at 97, R. 97). On December 19, 2016, Larissa filed a written request for a hearing, which was granted. (Id. at 113-20, R. 113-20).

On November 8, 2018, Administrative Law Judge ("ALJ") Teresa A. Kroenecke conducted a hearing, where Larissa and vocational expert Matthew C. Lampley appeared. (Dkt. 13-2 at 30-65, R. 30-65; Dkt. 13-4 at 10-13, R. 295-298). On February 12, 2019, ALJ Kroenecke issued an unfavorable decision finding Larissa was not disabled. (Dkt. 13-2 at 10-23, R. 10-23). Larissa appealed the ALJ's decision and, on December 13, 2019, the Appeals Council denied Larissa's request for review, making the ALJ's decision final. (Dkt. 13-2 at 1-3, R. 1-3). Larissa now seeks judicial review of the ALJ's decision denying benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

# II.    STANDARD OF REVIEW

To qualify for Title II DIB, a claimant must be disabled within the meaning of the Social Security Act. To prove disability, a claimant must show she is unable to "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). To meet this definition, a claimant's impairments must be of such severity that she is not able to perform the work she previously engaged in and, based on her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The SSA has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a). The ALJ must consider whether:

> (1) the claimant is presently [un]employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves [her] unable to perform [her] past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005) (citation omitted). An affirmative answer to each step leads either to the next step or, at steps three and five, to a finding that the claimant is disabled. 20 C.F.R. § 404.1520; *Briscoe*, 425 F.3d at 352. If a claimant satisfies steps one and two, but not three, then she must satisfy step four. Once step four is satisfied, the burden shifts to the SSA to establish that the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995); *see also* 20 C.F.R.

§ 404.1520. (A negative answer at any point, other than step three, terminates the inquiry and leads to a determination that the claimant is not disabled.).

After step three, but before step four, the ALJ must determine a claimant's residual functional capacity ("RFC") by evaluating "all limitations that arise from medically determinable impairments, even those that are not severe." *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC is an assessment of what a claimant can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004). In making this assessment, the ALJ must consider all the relevant evidence in the record. *Id.* at 1001. The ALJ uses the RFC at step four to determine whether the claimant can perform her own past relevant work and if not, at step five to determine whether the claimant can perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(iv)-(v).

The claimant bears the burden of proof through step four. *Briscoe*, 425 F.3d at 352. If the first four steps are met, the burden shifts to the Commissioner at step five. *Id.* The Commissioner must then establish that the claimant – in light of her age, education, job experience, and residual functional capacity to work – is capable of performing other work and that such work exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f).

Judicial review of the Commissioner's denial of benefits is to determine whether it was supported by substantial evidence or is the result of an error of law. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This review is limited to determining whether the ALJ's decision adequately discusses the issues and is

based on substantial evidence. Substantial evidence "means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019); *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). Thus, the issue before the Court is not whether Larissa is disabled, but, rather, whether the ALJ's findings were supported by substantial evidence. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

Under this administrative law substantial evidence standard, the Court reviews the ALJ's decision to determine if there is a logical and accurate bridge between the evidence and the conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). In this substantial evidence determination, the Court must consider the entire administrative record but not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Nevertheless, the Court must conduct a critical review of the evidence before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *see also Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When an ALJ denies benefits, she must build an "accurate and logical bridge from the evidence to [her] conclusion," *Clifford*, 227 F.3d at 872, articulating a

minimal, but legitimate, justification for the decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford*, 227 F.3d at 872.

### III.  BACKGROUND

#### A. Larissa's Medical History[2]

On May 19, 2015, Larissa presented to Dr. Mark Tiritilli with IU Health Medical Group Cottage Corner for a new patient exam. (Dkt. 13-4 at 117-118, R. 402-403). At that time, Larissa's diagnoses included fibromyalgia, chronic low back pain, shoulder pain, lower limb pain, anxiety, and obesity. (Id.). During the exam, Larissa complained of bilateral leg pain that occasionally worsens with walking. (Id. at 118, R. 403). Dr. Tiritilli noted that Larissa had no ulcers on her legs but, on exam, her legs felt warm. (Id). Given Larissa's history as a cigarette smoker, Dr. Tiritilli ordered an arterial doppler study to rule out peripheral vascular disease as the cause of Larissa's leg pain.[3] (Id. at 118-119, R. 403-404).

---

[2] The Court has reviewed hundreds of pages of medical records, some of which were generated during medical visits unrelated to Larissa's present claims. For purposes of this opinion, the Court will focus on the medical records relevant to Larissa's postural orthostatic tachycardia syndrome and her gait.

[3] Peripheral vascular disease is a blood circulation disorder that causes the blood vessels outside of an individual's heart and brain to narrow, block, or spasm. This typically causes pain and fatigue, often in the legs, and especially during exercise. *Peripheral Vascular Disease*, HEALTHLINE, https://www.healthline.com/health/peripheral-vascular-disease (last visited Apr. 17, 2021).

On August 3, 2015, Larissa saw Dr. Tiritilli for a follow-up appointment related to her low back pain, fibromyalgia, and obesity. (Dkt. 13-4 at 93-94, R. 378-379). During the visit, Larissa reported that she missed her arterial doppler appointment. (Id. at 94, R. 379). Since Larissa was still having bilateral leg pain that worsened with activity, Dr. Tiritilli ordered another arterial doppler study. (Id.). Larissa also reported that in July, she had a near syncope experience while at her aerobics class. (Id.). Dr. Tiritilli noted that Larissa had been diagnosed with vasovagal syncope[4], and on exam, Larissa had a normal sinus rhythm. (Id.). Dr. Tiritilli recommended that Larissa have an electrocardiogram[5] to evaluate for

---

[4] Syncope is the medical term for fainting or passing out. *Syncope*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Mar. 29, 2021). Syncope is often related to another medical condition that may involve a person's heart, nervous system, or blood flow to the brain. *Id.* There are several different types of syncope. Vasovagal syncope, also known as neurocardiogenic or cardio-neurogenic syncope, is the most common type of syncope. *Id.*; *Vasovagal Syndrome*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/syc-20350527 (last visited Mar. 23, 2021). It is caused by a sudden drop in blood pressure, which causes a drop in blood flow to the brain. *Syncope*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Mar. 29, 2021). Some individuals with vasovagal syncope have a condition called orthostatic hypotension – a condition that keeps blood vessels from getting small (as they should) when a person stands – which causes blood to collect in a person's legs, leading to a quick drop in blood pressure. *Id.*

[5] An electrocardiogram is a test that measures the electrical activity of the heartbeat. It records how fast the heart is beating, the rhythm of the heart beats (steady or irregular), and the strength and timing of the electrical impulses as they move through the different parts of the heart. *Electrocardiogram (ECG or EKG)*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/heart-attack/diagnosing-a-heart-attack/electrocardiogram-ecg-or-ekg (last visited Mar. 23, 2021); *Electrocardiogram*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electrocardiogram (last visited Mar. 23, 2021).

tachycardia[6]; wear a Holter monitor[7] to evaluate her pre-syncope[8] state; and undergo an echocardiogram[9] test because of her complaints of shortness of breath and lightheadedness. (Id.). At this visit, Dr. Tiritilli also noted that Larissa had a history of anxiety and depression and referred Larissa for a psychiatry consultation. (Id.). Larissa was able to have an electrocardiogram performed the same day as her appointment, which came back normal and showed a normal sinus rhythm. (Id. at 131, R. 416). Larissa underwent an arterial doppler study at the end of August, which revealed normal perfusion[10] in her lower extremities. (Dkt. 13-5 at 19, R. 479).

On September 16, 2015, Larissa presented to the Eskenazi Health Echocardiographic Laboratory for a 2D echocardiogram. (Dkt. 13-4 at 129, R. 414).

---

[6] Tachycardia refers to a heart rate that is too fast, which generally for adults is a heart rate of more than 100 beats per minute. *Tachycardia: Fast Heart Rate*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/arrhythmia/about-arrhythmia/tachycardia--fast-heart-rate (last visited Mar. 23, 2021).

[7] A Holter monitor is a small, battery-operated portable device that measures and records an individual's heart activity continuously for 24 to 48 hours. A physician may ask a patient to wear a Holter monitor if the patient has fast, slow, or irregular heartbeats. *Holter Monitor*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/heart-attack/diagnosing-a-heart-attack/holter-monitor (last visited Mar. 23, 2021).

[8] Pre-syncope is the feeling that you are about to faint. An individual with pre-syncope may be lightheaded, dizzy, nauseated, have a visual "gray out" or trouble hearing, have palpitations, or feel weak or suddenly sweaty. *Syncope (Fainting)*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/syncope-fainting (last visited Apr. 11, 2021).

[9] An echocardiogram is a test that uses high frequency sound waves (ultrasound) to create pictures of an individual's heart. A physician may order an echocardiogram to determine the size and shape of a patient's heart; the size, thickness, and movement of a patient's heart's walls; how a patient's heart moves; a patient's heart's pumping strength; and whether the patient's heart valves are working correctly, blood is leaking backwards through the patient's heart valves, the patient's heart valves are too narrow, or there is a tumor or infectious growth around the patient's heart valves. *Echocardiogram (Echo)*, AM. HEART ASS'N, https://www.heart.org/en/health-topics/heart-attack/diagnosing-a-heart-attack/echocardiogram-echo (last visited Mar. 23, 2021).

[10] "Perfusion" refers to the circulation of blood through a specific organ or area of the body. *Perfusion*, TABER'S MEDICAL DICTIONARY, https://www.tabers.com/tabersonline/view/Tabers-Dictionary/746242/all/perfusion (last visited Apr. 17, 2021); *Perfusion*, HARVARD MEDICAL SCHOOL: MEDICAL DICTIONARY OF HEALTH TERMS: J-P, https://www.health.harvard.edu/j-through-p (last visited Apr. 17, 2021).

The test resulted in normal findings. (Id.). That same day, Larissa also began her Holter monitor test[11], which spanned 24 hours and indicated:

1) The predominant rhythm was sinus with rates ranging from 53-165 (ave. 101)/min.
2) Almost no atrial ectopic activity occurred (53 total non-sinus complexes), only as isolated events. Neither couplets nor runs of supraventricular tachycardia occurred.
3) Almost no ventricular ectopic activity occurred (2 total premature complexes), only as isolated events. Neither couplets nor runs of ventricular tachycardia occurred.
4) No significant bradycardia or pauses occurred.
5) Symptoms of lightheaded[ness] and dizz[iness] reported on 4 occasions during waking up or standing up, each during sinus rhythm at 80-110/min without ectopy or evident ST-T changes in the 3 monitored leads.

(Id. at 130, R. 415). It also noted that Larissa's predominant rhythm was sinus tachycardia with intermittent sinus arrhythmia.[12] (Id.).

On September 23, 2015, Larissa saw social worker Laura Jefferson for an initial assessment for depression. (Dkt. 13-4 at 126-127, R. 411-412). At the visit, Larissa reported being diagnosed with neurocardiogenic syncope (vasovagal syncope) at 15, which has caused her lifelong chronic pain in her legs, hips, back, and shoulders. (Id. at 127, R. 412). Ms. Jefferson recommended that Larissa participate in cognitive behavioral therapy as well as a walking program. (Id.).

---

[11] The Holter monitor test is used to exclude arrhythmogenic causes of syncope. Emily M. Garland & Satish R. Raj, *Differential Diagnosis of Vasovagal Syncope: Postural Orthostatic Tachycardia*, VASOVAGAL SYNCOPE 179-188 (Aug. 6, 2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles /PMC7123721/.

[12] Heart rhythm problems (heart arrythmias) occur when the electrical impulses that coordinate a person's heartbeat do not work properly. The term "arrhythmia" refers to any change from the normal sequence of electrical impulses causing the heart to beat too fast, too slow, or irregularly. *Heart arrhythmia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/heart-arrhythmia/symptoms-causes/syc-20350668 (last visited Mar. 26, 2021); *About Arrhythmia*, AM. HEART ASS'N, https://www.mayoclinic.org/diseases-conditions/heart-arrhythmia/symptoms-causes/syc-20350668 (last visited Mar. 26, 2021).

On October 5, 2015, Larissa saw Dr. Myrtice Macon for an initial evaluation of her back pain. (Dkt. 13-4 at 58-59, R. 343-344). In reviewing Larissa's systems, Dr. Macon noted positivity for dizziness and palpitations. (Id.). He also noted that Larissa's September 25, 2015 spine MRI demonstrated degenerative changes at the L4-5 level with mild canal stenosis and mild left neuroforaminal narrowing at L4. (Id. at 59, R. 344). Dr. Macon informed Larissa that bilateral sacroiliac joint injections with fluoroscopy could be performed, but Larissa preferred to wait until her tilt table test was completed because of her history of syncope. (Id.).

On October 28, 2015, Larissa presented to IU Health Methodist for her tilt table test.[13] (Dkt. 13-5 at 42-43, R. 502-503). During the head up passive tilt, Larissa "exhibited progressive rise in heart rate to sinus tachycardia 120 bpm followed by abrupt drop in the heart rate to sinus bradycardia 52 bpm and simultaneous drop of systolic blood pressure to 60mmHg and loss of consciousness. Both heart rate and blood pressure recovered readily with resumption of supine position." (Id. at 43, R. 503). Dr. Chao-Wen Lee concluded that Larissa had a positive passive tilt table response[14] for vasovagal response. (Id.).

On November 17, 2015, Larissa saw Dr. Tiritilli for a follow-up for her near syncope, anxiety, and other complaints. (Dkt. 13-4 at 38-39, R. 323-324). Dr. Tiritilli

---

[13] A tilt table test has an individual lie on a table that is slowly tilted upward. It is used to evaluate the cause of unexplained fainting. *Tilt Table Test*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/tilt-table-test/about/pac-20395124 (last visited Mar. 26, 2021).

[14] A positive tilt table test means a person may have a condition that causes an abnormal change in blood pressure, heart rate, or heart rhythm. *Tilt Table Test*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diagnostics/17043-tilt-table-test (last visited Mar. 26, 2021).

noted that Larissa's recent tilt table test showed positive vasomotor syncope[15] and that arrangements were being made for Larissa to meet with an electrophysiologist at Methodist. (Id. at 39, R. 24). Dr. Tiritilli recommended Larissa complete physical therapy and undergo a sleep study. (Id.).

Nearly two weeks later, on November 30, 2015, Larissa had an electrocardiogram performed for her syncope. (Dkt. 13-5 at 41, R. 501). Cardiologist Dr. Jeffrey Mossler concluded that the electrocardiogram was normal, demonstrating normal sinus rhythm. (Id.).

The next day, December 1, 2015, Larissa presented to Dr. Mossler for a follow-up visit. (Dkt. 13-5 at 14-15, R. 474-475). Dr. Mossler noted that Larissa had a history of recurrent syncope as a child and lately had been getting dizzy upon standing. (Id. at 14, R. 474). Larissa described the sensation as dizziness and feeling like she might pass out. (Id.). Dr. Mossler stated he was able to reproduce the symptoms in the office and that Larissa was dizzy when her blood pressure and heart rate were both elevated. (Id.). Dr. Mossler noted that Larissa had a "cardioinhibitory and vasodepressor response to head-up tilt" that "occurred 17 minutes into the tilt and occurred spontaneously without provocation from sublingual nitroglycerin or isoproterenol," but has not had any recent syncopal episodes. (Id.). Dr. Mossler opined that Larissa's described symptoms sounded

---

[15] This is the most common noncardiac cause of syncope. It occurs when a large proportion of blood is pooled in the legs. This causes a fall in blood pressure, lack of blood flow to the brain, and syncope. Gunjan Shukla & Peter Zimetbaum, *Syncope*, 113 CIRCULATION AM. HEART ASS'N e715, e715-e717 (Apr. 25, 2006), *available at* https://www.ahajournals.org/doi/full/10.1161/CIRCULATION AHA.105.602250#:~:text=Vasomotor%20syncope%20is%20the%20most,to%20the%20brain%2C%20a nd%20syncope.

somewhat more like vertigo with ringing in her ears and feeling lightheaded upon standing. (Id.). He also opined that it was unclear the significance of the positive tilt table test, particularly since he could demonstrate that Larissa was symptomatic while hypertensive and tachycardic in the office. (Id.). Dr. Mossler's cardiac examination revealed a regular tachycardic rhythm, with no murmurs or gallops. (Id.). Dr. Mossler started Larissa on Metoprolol Succinate[16], with Larissa to follow-up in six weeks. (Id.).

On December 2, 2015, Larissa saw Dr. Tiritilli for an urgent visit for near syncope. (Dkt. 13-4 at 34-35, R. 319-320). Dr. Tiritilli noted the results of the tilt table test, which demonstrated vasomotor syncope, and he also noted that Larissa had no syncope since her visit with him in November. (Id.). During the appointment, Larissa reported that the cardiologist was concerned that some of her symptoms, such as her dizziness and blurred vision just prior to the feeling of passing out, may be more neurologic in nature. (Id. at 34, R. 319). Larissa also reported that the Metoprolol made her very sleepy. (Id.). Dr. Tiritilli decreased Larissa's dosage of Metoprolol, advised her to follow-up in three months, and recommended that she see a neurologist. (Id. at 34-35, R. 319-320).

On January 11, 2016, Larissa returned to Dr. Mossler. (Dkt. 13-5 at 12, R. 472). Dr. Mossler reviewed the recent tilt table test and noted Larissa's history of

---

[16] This is a beta blocker used to treat chest pain, heart failure, and high blood pressure. *Metoprolol Succinate*, WEBMD, https://www.webmd.com/drugs/2/drug-8814/metoprolol-succinate-oral/details (last visited Mar. 26, 2021). Beta blockers are medications that reduce a person's blood pressure. *Beta blockers*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/high-blood-pressure/in-depth/beta-blockers/art-20044522 (last visited Mar. 26, 2021).

situational syncope.[17] (Id.). Dr. Mossler noted that Larissa's only episode of spontaneous occurring syncope without provocation occurred when Larissa was around 15 years old. (Id.). He also noted that during the visit, Larissa had hypertension and tachycardia and was symptomatic while both hypertensive and tachycardic with dizziness, "leading him to believe her dizziness was not likely related to her situational syncope." (Id.). Dr. Mossler decided to discontinue Larissa's Midodrine[18] prescription because Larissa had not noticed any appreciable differences in her symptoms. (Id.). Dr. Mossler's cardiac examination revealed a regular rate and rhythm with no murmurs or gallops. (Id.). Dr. Mossler did not believe Larissa's dizziness was cardiovascular related and opined that her syncopal episodes seemed to be situational when she was upset. (Id.).

On February 11, 2016, Larissa presented to Dr. Anil Achaen for evaluation of her daytime sleepiness and to follow-up concerning her sleep study. (Dkt. 13-5 at 4-7, R. 464-467). Dr. Achaen noted that Larissa had a positive tilt table test,

---

[17] Situational syncope is another type of vasovagal syncope that only happens during certain situations affecting the nervous system, such as dehydration, intense emotional stress, anxiety, fear, and pain. *Syncope*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Mar. 29, 2021). There are several different types of syncope. The type you have depends on what causes the problem. Other types of syncope include: postural syncope (*i.e.*, syncope caused by a sudden drop in blood pressure due to a quick change in position, such as from lying down to standing); cardiac syncope (*i.e.*, syncope caused by a heart or blood vessel condition, such as an abnormal heart rhythm (arrhythmia), obstructed blood flow in the heart due to structural heart disease (the way the heart is formed), blockage in the cardiac blood vessels (myocardial ischemia), valve disease, aortic stenosis, blood clot, or heart failure) that affects blood flow to the brain; and neurologic syncope (*i.e.*, syncope caused by a neurological condition such as seizure, stroke, or transient ischemic attack). *Id.*

[18] This medication is used for certain patients who have symptoms of low blood pressure upon standing (a condition known as orthostatic hypertension), whose daily activities are severely affected by the condition. The medication acts on the blood vessels to raise blood pressure. *Midodrine HCL*, WEBMD, https://www.webmd.com/drugs/2/drug-14042/midodrine-oral/details (last visited Mar. 26, 2021).

symptoms of narcolepsy, and that Larissa reported that she passes out when she gets stressed out. (Id. at 4, R. 464). Dr. Achaen diagnosed Larissa with narcolepsy and cataplexy and ordered a sleep test. (Id. at 6, R. 466). He opined that Larissa's syncope might be explained by the results of the sleep test. (Id. at 6, R. 466).

After the sleep test, Larissa returned to Dr. Achaen on February 18, 2016. (Dkt. 13-5 at 8-11, R. 468-471). Dr. Achaen diagnosed Larissa with idiopathic hypersomnia without long sleep time and prescribed Provigil. (Id. at 8,10, R. 468, 470).

On March 22, 2016, Larissa had a consult with Dr. Ryan Gleason at the Methodist Neurology Clinic for her syncope and pain. (Dkt. 13-5 at 16-18, 98, R. 476-478, 558). During the visit, Larissa reported that her first episode of syncope occurred when she was 7 years old. (Id. at 16, R. 476). Dr. Gleason also noted that Larissa has had a number of episodes of syncope or near syncope. (Id.). Larissa also reported difficulty standing for prolonged periods of time and trouble walking. (Id. at 16-17, R. 476, 477). On physical examination, Dr. Gleason noted that Larissa's gait was normal and that she had no lightheadedness with brief walking. (Id. at 17, R. 477).

After completing his examination of Larissa and reviewing the Holter monitor test, the tilt table test, and other records, Dr. Gleason diagnosed Larissa with postural orthostatic tachycardia syndrome ("POTS")[19], Raynaud's

---

[19] POTS is a form of dysautonomia – a disorder of the autonomic nervous system. This branch of the nervous system regulates functions a person does not consciously control, such as heart rate, blood pressure, sweating, and body temperature. *Postural Orthostatic Tachycardia Syndrome (POTS)*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-

phenomenon, and diffuse pain and hypersensitivity. (Dkt. 13-5 at 17, R. 477). He also suspected additional functional disability from mild conversion symptoms as well as unrelated depression and anxiety. (Id.). Larissa was somewhat resistant to the idea that some, but not all, of her symptoms she was experiencing were related to depression and anxiety. (Id.). Dr. Gleason opined that Larissa seemed to be functionally limited and was experiencing significant disability associated with her anxiety and reactive depression around her long-term issues with POTS. (Id. at 18, R. 478). Dr. Gleason encouraged Larissa to engage in cardiovascular exercise, walking, and jogging and to slowly increase her amount of exercise to address her symptoms. (Id.).

On March 28, 2016, Larissa presented to Dr. Tiritilli. (Dkt. 13-5 at 95-96, R. 555-556). Dr. Tiritilli noted that Larissa's cardiologist and neurologist opined that her positive tilt table test was the result of POTS. (Id. at 96, R. 556).

On May 11, 2016, Larissa saw Dr. Gleason for a follow-up for her POTS. (Dkt. 13-6 at 46-48, R. 617-619). Larissa complained of "hurting all the time," with her dizziness being more of a background issue. (Id. at 46, R. 617). Larissa reported

---

orthostatic-tachycardia-syndrome-pots (last visited Mar. 26, 2021). POTS causes a very fast heart rate (tachycardia) that happens when a person stands after sitting or lying down. *Syncope*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Apr. 1, 2021). The main distinguishing symptoms of POTS are a rapid increase in heartbeat of more than 30 beats per minute and a heart rate that exceeds 120 beats per minute within 10 minutes of standing. Other symptoms of POTS include fainting, dizziness, and fatigue. *Postural Orthostatic Tachycardia Syndrome (POTS)*, CEDARS SINAI, https://www.cedars-sinai.org/health-library/diseases-and-conditions/p/postural-orthostatic-tachycardia-syndrome-pots.html (last visited Mar. 23, 2021). POTS is diagnosed only when orthostatic hypotension is ruled out and when there is no acute dehydration or blood loss. *Postural Orthostatic Tachycardia Syndrome (POTS)*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/postural-orthostatic-tachycardia-syndrome-pots (last visited Apr. 1, 2021).

that since her last visit, she was still dizzy upon standing. (Id.). She also stated that "she does not have syncope unless she is in a hospital or doctor's office or sick." (Id.). Dr. Gleason interpreted this statement as indicating Larissa was tolerating her syncope fairly well. (Id.). Upon physical examination, Dr. Gleason noted that Larissa became somewhat lightheaded and dizzy when standing for about 25 seconds, and that the sensation ceased when Larissa propped herself up on the side of the exam chair with minimal change in leg position. (Id. at 47, R. 618). Noting that Larissa had tried and failed Florinef[20], Midodrine, Metoprolol, and pyridostigmine/Mestinon[21], he prescribed Propranolol.[22] (Id.). He encouraged Larissa to do some activities to raise her heart rate a few times per day in short amounts and to slowly increase from there. (Id.).

On May 31, 2016, Larissa saw Dr. J. Mark Dobbs of Indy Psych for a mental status examination as part of the process for applying for disability benefits. (Dkt. 13-6 at 143-147, R. 714-718; Dkt. 13-7, 1-3, R. 719-721). During the consult, Larissa reported that she fainted every time she was afraid, but she was fainting less and

---

[20] This medication is used to treat low glucocorticoid levels caused by disease of the adrenal gland. *Florinef Tablet*, WEBMD, https://www.mayoclinic.org/diseases-conditions/myasthenia-gravis/symptoms-causes/syc-20352036 (last visited Mar. 26, 2021). Adrenal glands produce hormones that help regulate a person's metabolism, immune system, blood pressure, response to stress, and other essential functions. *Adrenal Glands*, JOHNS HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/adrenal-glands (last visited Mar. 26, 2021).
[21] This medication is used to improve muscle strength in patients with myasthenia gravis (a muscle disease characterized by weakness and rapid fatigue of any of the muscles under a person's voluntary control). *Pyridostigmine Bromide*, WEBMD, https://www.webmd.com/drugs/2/drug-3753/pyridostigmine-bromide-oral/details (last visited Mar. 26, 2021); *Myasthenia gravis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/myasthenia-gravis/symptoms-causes/syc-20352036 (last visited Mar. 26, 2021).
[22] This is a beta blocker used to treat high blood pressure, irregular heartbeats, shaking (tremors), and other conditions. *Propranolol Oral*, WEBMD, https://www.webmd.com/drugs/2/drug-10404-9168/propranolol-oral/propranolol-oral/details (last visited Mar. 26, 2021).

becoming increasingly more dizzy. (Dkt. 13-6 at 143, R. 714). Larissa also reported her POTS diagnosis, difficulty walking, and feeling irritable when having to stand or walk. (Id. at 144, 147, R. 715, 718; Dkt. 13-7 at 1, R. 719). Dr. Dobbs noted that Larissa was less prone to fainting because she had learned her triggers well and was working to prevent syncope-related problems. (Dkt. 13-6 at 143, R. 714). Dr. Dobbs opined that Larissa met the criteria for medically-related depression and anxiety, and that her behavioral and medical problems were consistent with POTS. (Dkt. 13-7 at 2, R. 720).

On July 11, 2016, Larissa presented to the Indiana State Disability Determination Bureau for a consultative examination with Dr. Roland Wilson. (Dkt. 13-7 at 28-32, R. 746-750). In the "History of Present Complaint" section, Dr. Wilson wrote that Larissa stated that she has postural orthostatic tachycardia, dizzy spells, and that she could not sit or stand for more than 15 minutes and walk no more than 5 minutes. (Dkt. 13-7 at 28, R. 746). As part of his physical examination, Dr. Wilson found Larissa's gait to be stable and within normal limits. (Dkt. 13-7 at 31, R. 749). He noted, however, that Larissa's gait was probably not sustainable given her history. (Id.). On July 18, 2016, Dr. Wilson provided additional data related to his consultative exam, wherein he noted that Larissa's blood pressure at sitting, lying down, and standing was 116/80, 118/78, and 122/90 respectively, and that her heart rate at sitting, lying down, and standing was 80, 85, and 100 respectively. (Id. at 63-64, R. 781, 782).

On July 18, 2016, state agency medical consultant Dr. J. Sands reviewed Larissa's medical records to make a disability determination at the initial level. (Dkt. 13-2 at 69-80, R. 69-80). Dr. Sands determined that Larissa had the following medically determinable impairments: affective disorders (primary), anxiety disorders (secondary), essential hypertension (other), fibromyalgia (other), and other disorders of the nervous system (other). (Id. at 74, R. 74). He assessed Larissa for affective disorders (Listing 12.04) and anxiety disorders (Listing 12.06) and determined that Larissa was not disabled. (Id. at 74-75, R. 74-75). As part of his residual functional capacity assessment, Dr. Sands opined that Larissa could sit, stand, and/or walk for about 6 hours in an 8-hour workday. (Id. at 76, R. 76). While Larissa alleged orthostasis, Dr. Sands noted that Larissa had no change in her blood pressure with lying, sitting, or standing at the consultative examination. (Id.).

On August 18, 2016, Larissa saw Dr. Achaen for a follow-up of her hypersomnia and narcolepsy. (Dkt. 13-8 at 18-21, R. 864-867). He continued Larissa on Adderall and switched Larissa from gabapentin to Cymbalta, with instruction to follow-up in six months. (Id. at 20, R. 866).

On August 29, 2016, Larissa returned to Dr. Gleason for a follow-up. (Dkt. 13-6 at 87-88, R. 658-659). Larissa informed Dr. Gleason that she continues to occasionally get pre-syncopal sensations on an almost daily basis, but her symptoms were not getting worse but were not particularly better. (Id.). Larissa noted that the Propranolol increased her fatigue and that it did not provide any benefit. (Id.). Larissa also reported that she had been engaging in home exercise stretching and

18

working on a ball. (Id.). Dr. Gleason decided to terminate Larissa from medication because she had been intolerant to every medication that he had previously tried. (Id. at 88, R. 659). Dr. Gleason advised Larissa to continue, but slowly increase, her daily aerobic exercise. (Id.). He also recommended that Larissa continue to avoid caffeine, practice good sleep hygiene, decrease her stress and anxiety, and increase her water intake to address her symptoms. (Id.).

On November 3, 2016, state agency medical consultant Dr. Joshua Eskonen reviewed Larissa's medical records at the reconsideration level and affirmed Dr. Sands' previous assessment. (Dkt. 13-2 at 82-96, R. 82-96).

Over the next year, Larissa had several visits with Dr. Achaen to address her hypersomnia and narcolepsy. (Dkt. 13-8 at 97-110, R. 943-956). Dr. Achaen noted on February 1, 2017, August 3, 2017, and January 4, 2018, that the prescriptions Adderall and Provigil aided Larissa, and continued her on those medications. (Id.). On January 4, 2018, Dr. Achaen started Larissa on Protriptyline. (Dkt. 13-8 at 100, R. 946).

During this same time period, Larissa began seeing Dr. Adam Comer of the Eskenazi Health Neurology Clinic for her pain in her lower extremities. (Dkt. 13-9 at 43, R.1019). During her September 6, 2017 visit, Larissa reported leg pain, but noted that the pain improves with walking and that exercise has significantly helped with her pain in the past. (Id.). On physical examination, Dr. Comer noted that Larissa's heart rate and rhythm were normal, and that Larissa's casual walking was unremarkable. (Id. at 45, R. 1021). Given Larissa's favorable response

to exercise, Dr. Comer referred her to physical therapy. (Id. at 46, R. 1022). Dr. Comer opined that Larissa's symptoms were most likely related to fibromyalgia or a chronic pain syndrome. (Id.).

At Larissa's follow-up appointments in December 2017 and March 2018, Dr. Comer noted that Larissa's gait was normal. (Dkt. 13-9 at 40-42, 50, R. 1016-1018, 1028; Dkt. 13-13 at 47-50, R. 1314-1317). During the December 2017 exam, Dr. Comer recommended that Larissa exercise regularly at home since she had decided to not go to physical therapy. (Dkt. 13-9 at 40, 42, R. 1016, 1018). At the March 2018 appointment, Dr. Comer reviewed Larissa's labs and noted that they were unremarkable, which reaffirmed his belief that it was more likely that Larissa had a chronic myofascial pain syndrome/fibromyalgia. (Dkt. 13-13 at 49-50, R. 1316-1317). Dr. Comer recommended a brain MRI to rule out multiple sclerosis and referral to an integrative pain clinic. (Id. at 50, R. 1317).

The morning of June 15, 2018, Larissa presented to Eskenazi Health Cardiac Diagnostics Lab for a CD Transthoracic Echo (TEE) Complete and was diagnosed with cardiac murmur, unspecified; tachycardia, unspecified; and orthostatic hypotension. (Dkt. 13-10 at 29-38, R. 1079-1088). That same day in the Cardiac Lab, Larissa presented for a 24-hour Holter monitor test. (Dkt. 13-11 at 3-39, R. 1121-1157). Larissa's Holter monitor test indicated:

1) The predominant rhythm was sinus rhythm with rates ranging from 66-152 (average 104) beats per min (bpm), PR, QRS, and QT intervals were within normal limits.
2) Very rare ventricular ectopic activity was seen (<0.1% of all complexes, total 1 beat), mainly as isolated events (with one dominant PVC morphology) with no paired PVCs,

20

Bigeminy/Trigeminy beats or runs of ventricular tachycardia. No symptoms were associated with this PVC.

3) Only one isolated atrial ectopic beat occurred (<<0.1% of all complexes) with no other atrial arrhythmia.

4) No significant bradycardia or pauses occurred.

5) Patient events were reported on 7 separate occasions during sinus rhythm at 114-128 beats/min, which were not associated with any arrhythmia or evident ST changes in the 3 monitored leads. Sweating, exhausted, pukish, dizzy, couldn't see, and tired symptoms was reported on 6 occasions during sinus tachycardia at 105-131 beats/min, which were not associated with any arrhythmia or evident ST changes in the 3 monitored leads.

(Id. at 3, R. 1121).

On September 5, 2018, Larissa returned to Dr. Comer and reported that she had not attended the required pain clinic classes that he had previously referred her to because she did not have time. (Dkt. 13-13 at 21, R. 1288). Dr. Comer noted that Larissa's brain MRI was unremarkable and that a prior EMG of her legs was normal. (Id.). On physical examination, Dr. Comer noted that Larissa's casual walking was unremarkable. (Id. at 23, R. 1290). Dr. Comer again noted that he suspects underlying chronic myofascial pain syndrome/fibromyalgia and recommended she return to the clinic in a year. (Id.).

## B. Factual Background

Larissa was thirty-five years old as of her June 1, 2015 alleged onset date. (Dkt. 13-2 at 69, R. 69). She has completed high school. (Id. at 79, R. 79). She reported relevant past work as an office manager and human resources assistant. (Id.).

## C. ALJ Decision

In determining whether Larissa qualified for benefits under the Act, the ALJ

employed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a) and concluded that Larissa was not disabled. (Dkt. 13-2 at 10-23, R. 10-23). At Step One, the ALJ found that Larissa had not engaged in substantial gainful activity since her alleged onset date of June 1, 2015. (Id. at 12, R. 12).

At Step Two, the ALJ found that Larissa suffered from the following severe impairments: fibromyalgia, cervical and lumbar degenerative disc disease, postural orthostatic tachycardia syndrome, hypertension, idiopathic hypersomnia/narcolepsy, Raynaud's syndrome, obesity, depression, and anxiety. (Id.).

At Step Three, the ALJ found that Larissa's impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (Id. at 12-16, R. 12-16). The ALJ determined that Larissa's fibromyalgia and narcolepsy could not meet a listing because they are not listed impairments in the listings in Appendix 1 nor do they equal a Listing alone or in combination. (Id. at 13-14, R. 13-14). The ALJ assessed that Larissa's physical impairments did not meet or medically equal the severity of Listing 1.04 for her lumbar degenerative disc disease; Listing 4.05 for her postural orthostatic tachycardia syndrome; Listing 14.04(C) for her Raynaud's syndrome; and Listings 1.01, 3.01, and 4.01 for her obesity. (Id.). The ALJ further determined that Larissa's mental impairments, considered singly and in combination, did not meet or medically equal the severity criteria of Listings 12.04 and 12.06. (Id. at 14, R. 14).

After Step Three but before Step Four, the ALJ found that Larissa had the residual functional capacity ("RFC") to perform sedentary work, except Larissa:

- Can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds;

- Can occasionally stoop, but can never kneel, crouch, or crawl;

- Can occasionally overhead reach with bilateral upper extremities;

- Must never be exposed to extreme heat, extreme cold, humidity, wetness, vibrations, or hazards such as unprotected heights or dangerous moving machinery;

- Can stand for 30-45 minutes at a time for a total of up to 2 hours in the 8-hour workday and walk for 30-45 minutes at a time for a total of up to 2 hours in the 8-hour workday;

- Can understand, remember, and carry out short, simple, and routine instructions;

- Can sustain attention and/or concentration for 2 hour periods at a time in an 8-hour workday on short, simple, routine tasks; and

- Cannot do fast-paced production work such as assembly line work.

(Id. at 16, R. 16).

At Step Four, the ALJ concluded that Larissa is not able to perform any of her past relevant work. (Id. at 22, R. 22).

At Step Five, relying on the vocational expert's testimony, the ALJ determined that, considering Larissa's age, education, work experience, and

residual functional capacity, she was capable of adjusting to other work. (Id. at 22-23, R. 22-23). The ALJ concluded that Larissa was not disabled. (Id. at 23, R. 23).

## IV.   ANALYSIS

Larissa raises two challenges to the ALJ's decision, namely: (1) at Step Three, the ALJ erred in assessing whether her postural orthostatic tachycardia syndrome ("POTS") impairment met or medically equaled Listing 4.05, and (2) the ALJ erred when she failed to properly weigh all the medical opinion evidence when crafting her RFC. (Dkt. 20 at 14-22). The Court will consider these arguments in turn below.

### A.  Listing Determination

Regarding the Step Three determination, Larissa maintains that the ALJ erred when she failed to adequately analyze whether Plaintiff's POTS met or medically equaled the requirements of Listing 4.05 for Recurrent Arrhythmias. (Dkt. 20 at 14-18). In response, the Commissioner maintains that the ALJ's findings were supported by substantial evidence. (Dkt. 23 at 12-20).

Under Step Three of the sequential evaluation process, if a claimant has an impairment that meets or medically equals the criteria of an impairment found in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumptively disabled and qualifies for benefits. *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). The Listings specify the criteria for impairments that are considered presumptively disabling. *Minnick*, 775 F.3d at 935 (citing 20 C.F.R. § 404.1525(a)). A claimant may

also demonstrate presumptive disability by showing that her impairments are accompanied by symptoms that are equal in severity to those described in a specific listing. *Id.* (citing 20 C.F.R. § 404.1526).

It is the claimant's burden to prove that her condition meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006). To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment with medical findings. *Minnick*, 775 F.3d at 935; *Sims*, 309 F.3d at 428; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

To be considered presumptively disabled under Listing 4.05, a claimant must be able to show:

> Recurrent arrhythmias,[23] not related to reversible causes,…resulting in uncontrolled,[24]…recurrent[25]…episodes of cardiac syncope or near syncope,[26]…despite prescribed treatment…, and documented by resting or ambulatory (Holter) electrocardiography, or by other appropriate medically acceptable testing, coincident with the occurrence of syncope or near syncope.

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.05. In her brief, Larissa argues that her POTS diagnosis combined with her Holter monitor test and tilt table test provide

---

[23] The regulations define "arrhythmia" as a change in the regular beat of the heart. An individual's heart may seem to skip a beat or beat irregularly, very quickly (tachycardia), or very slowly (bradycardia). 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00F1.

[24] "Uncontrolled" means the impairment does not adequately respond to standard prescribed medical treatment." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00A3f.

[25] "Recurrent" is defined as "the longitudinal clinical record shows that, within a consecutive 12-month period, the finding(s) occurs at least three times, with intervening periods of improvement of sufficient duration that it is clear that separate events are involved." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00A3c.

[26] "Syncope" is defined as loss of consciousness or a faint, while "near syncope" is considered to be "a period of altered consciousness[.]"20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00F3b.

sufficient medical evidence that she meets or medically equals Listing 4.05. (Dkt. 20 at 15-16). Specifically, Larissa contends that these medical findings demonstrate that, despite medication, she continued to exhibit "recurrent episodes of cardiac syncope or near syncope," and thus the ALJ erred in failing to sufficiently analyze whether she met or medically equaled Listing 4.05. (Id.). Not objecting to the diagnosis or objective evidence, the Commissioner argues that Larissa has failed to carry her burden of demonstrating how these medical findings satisfy or medically equal the criteria of Listing 4.05. (Dkt. 23 at 16-17).

To demonstrate that a claimant's episodes of cardiac syncope or near syncope are recurrent under Listing 4.05, there must be medical evidence that demonstrates "within a consecutive 12-month period," the claimant experienced cardiac syncope or near syncope on "at least three" separate occasions. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00A3c. "Near syncope" requires a period of altered consciousness and not merely a feeling of light-headedness or dizziness. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00F3b.  Further, there must be a "documented association"[27] between the claimant's syncope or near syncope and her recurrent arrhythmia. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00F3c. The "recurrent arrhythmia," and not some other cardiac or non-cardiac disorder, must be the cause of the associated symptom. *Id.*

Upon review of the record, the Undersigned has not found facts that could support a finding that Plaintiff's POTS diagnosis combined with the findings of the

---

[27] The documented association between the symptoms and the arrhythmia may come from usual diagnostic methods, including Holter monitoring and tilt-table testing with a concurrent ECG. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 4.00F3c.

2015 Holter monitor test and the tilt table test met or medically equaled Listing 4.05. In attempts to determine the cause of Larissa's syncope symptoms, Dr. Mossler, her treating cardiologist, conducted a cardiac examination and noted that Larissa's heart had a regular tachycardic rhythm. (Dkt. 13-5 at 14, R. 474). He did not find any murmurs or gallops. (Id.). Dr. Mossler concluded that Larissa had baseline hypertension and was relatively tachycardic. (Id.). In his documentation, Dr. Mossler noted that the significance of Larissa's positive tilt table test was "unclear" because she was symptomatic while hypertensive and tachycardic in his office, and he ordered her to follow up in a few months. (Id.). After completing the cardiac examination during Larissa's follow-up visit, Dr. Mossler noted that Larissa had a regular rate and rhythm with no murmurs or gallops. (Id. at 12, R. 472). Dr. Mossler concluded that Larissa's syncopal episodes were situational when she was upset and, thus, did not recommend additional therapy. (Id.). Also, Dr. Mossler did not believe that Larissa's symptoms of dizziness were cardiovascular related, and suggested that she see a neurologist. (Id.).

Larissa's neurologist, Dr. Gleason, did observe Larissa becoming dizzy and lightheaded when she stood up, but noted that she was able to stop the sensation when she propped herself up against the side of the exam chair. (Dkt. 13-6 at 47, R. 618). Upon conducting a physical examination that demonstrated a regular heart rate and rhythm and reviewing the tilt table test and Holter monitor test, Dr. Gleason determined that Larissa's syncope was consistent with POTS.[28] (Dkt. 13-5

---

[28] Before one is diagnosed with POTS, a medical professional rules out other causes for the patient's increased heart rate including cardiomyopathy and inappropriate sinus tachycardia, which is a type

at 16-17, R. 476-477). To aid Larissa in addressing her syncopal symptoms, Dr. Gleason recommended that Larissa engage in cardiovascular activity, physical therapy, and occupational therapy. (Dkt. 13-5 at 18, R. 478).

There are no medical findings that suggest that Larissa's arrhythmia resulted in uncontrolled recurrent episodes of cardiac syncope or near syncope. While the record demonstrates that Larissa has experienced symptoms of lightheadedness and dizziness over a 12-month period, there is no evidence that supports a finding that this resulted in three separate syncope (*i.e.*, loss of consciousness) or near syncope (*i.e.*, a period of altered consciousness) events. Moreover, there is no evidence that Larissa's "recurrent arrhythmia" was the cause of her syncopal events and not some other cardiac or non-cardiac disorder like hypertension, anxiety, or the lack of exercise. Larissa's own treating cardiologist, Dr. Mossler, opined that the significance of her tilt table test was unclear since he was able to reproduce her symptoms while she was hypertensive and tachycardic in his office. (Dkt. 13-5 at 14, R. 474). Dr. Mossler also opined that Larissa's dizziness was not cardiovascular related and that her syncopal episodes seemed to be situational when she was upset. (Id. at 12, R. 472). Even Larissa, herself, stated that she passes out when she gets stressed out, and explained that she did not have syncope unless she was in a hospital or doctor's office or was sick. (Id. at 4, R. 464; Dkt. 13-6 at 46, R. 617). Dr. Gleason, who reviewed both her tilt table test and

---

of cardiac arrhythmia. Emily M. Garland & Satish R. Raj, *Differential Diagnosis of Vasovagal Syncope: Postural Orthostatic Tachycardia*, VASOVAGAL SYNCOPE 179-188 (Aug. 6, 2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7123721/.

Holter monitor test, opined that Larissa's problems were associated with her anxiety and reactive depression around her long-term issues with POTS. (Dkt. 13-5 at 16-18, R. 476-478).

For remand to be appropriate, a claimant is required to present medical evidence demonstrating that she would have satisfied the Step Three criteria, if the ALJ had considered all the issues. *Knox v. Astrue*, 327 F. App'x 652, 655 (7th Cir. 2009) (citing *Ribaudo*, 458 F.3d at 583). Larissa has failed to do so here. While Larissa contends that her diagnosis and testing results demonstrate that she meets or equals Listing 4.05, she fails to provide any analysis of the criteria to demonstrate how she meets or equals the requirements. Merely reciting the listing criteria, identifying the methods needed to prove the criteria, and then recounting a diagnosis and test findings is not enough. (Dkt. 20 at 15-16). An impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. § 404.1525(d).

Furthermore, while Larissa focuses on the fact that the ALJ did not mention the Holter monitor test in her decision, an ALJ need not address every piece of evidence in her decision so long as there is a bridge from the evidence to her conclusion. *Brandi M. v. Saul*, No. 1:19-cv-02972-JPH-DML, 2021 WL 99576, at *5 (S.D. Ind. Jan. 12, 2021) (internal citations omitted). Though the ALJ's Step Three analysis was cursory, the ALJ's decision, when read as a whole, provides substantial evidence for her Step Three analysis. *See Michael S. v. Comm'r of Soc. Sec.*, No. 19-cv-814-JPG, 2021 WL 1017134, at *7 (S.D. Ill. Mar. 17, 2021) (an "ALJ's

decision must be read as a whole, and an adequate discussion of the claimant's impairments, the objective medical evidence, and the claimant's credibility" may be found, in connection with the RFC, to support a Step Three finding) (citing *Zellweger v. Saul*, 984 F.3d 1251, 1252, 1254 (7th Cir. 2021); *Jeske v. Saul*, 955 F.3d 583, 590 (7th Cir. 2020); *Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 n. 5 (7th Cir. 2004) ("[I]t is proper to read the ALJ's decision as a whole, and...it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five"))). The Seventh Circuit does not require a high bar of articulation at Step Three, but requires the ALJ to discuss the specific listing she is considering by name and offer more than a perfunctory analysis. *Ribaudo*, 458 F.3d at 583 (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

At Step Three, the ALJ reasonably relied on the opinions of the state agency consulting physicians and psychologist who found that Larissa's impairments did not meet or equal a listing. (Dkt. 13-2 at 12-14, R. 12-14). State agency medical consultants, Dr. Patricia Garcia and Dr. J. Sands reviewed Larissa's medical records at the initial level, (Dkt. 13-2 at 69-80, R. 69-80), and determined Larissa was suffering with POTS, fibromyalgia, anxiety, depression and HTN (hypertension). (Dkt. 13-2 at 73, R. 73). This review included records from the Krannert Institute of Cardiology, (Dkt. 13-2 at 71, R. 71; Dkt. 13-5 at 32, 42-43, R. 492, 502-503), and Eskenazi Hospital, (Dkt. 13-2 at 72, R. 72; Dkt. 13-4 at 15, 130, R. 300, 415), which contained the tilt table assessment report and the 2015 Holter

monitor test report. Dr. Sands considered Larissa's impairments under Listing 12.04 for affective disorders and Listing 12.06 for anxiety disorder. (Dkt. 13-2 at 75, R. 75). Reviewing the medical records and evaluations, on reconsideration, Dr. Joshua Eskonen and Dr. Joelle Larsen agreed with Dr. Sands' findings. (Dkt. 13-2 at 92, 94, R. 92, 94). Drs. Sands and Eskonen submitted completed Disability Determination and Transmittal Forms concluding that Larissa's impairments did not meet or equal any listings through July 18, 2016 and November 4, 2016. (Dkt. 13-2 at 81, 97, R. 81, 97).

When there is no evidence that a claimant meets or equals a listing, the ALJ may properly rely on opinions of state agency reviewing medical consultants in the Listing analysis. *See Scheck*, 357 F.3 at 700 (holding when the physician indicates on the disability form that a claimant is not disabled, this statement conclusively establishes that consideration by a physician designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review).

When assessing the RFC, the ALJ noted that Larissa's cardiologist was "concerned that some [of Larissa's] symptoms may be more neurologic in nature in terms of her syncope/near syncope." (Dkt. 13-2 at 18, R. 18). The ALJ also noted Dr. Tiritilli's reliance on Dr. Mossler's findings that Larissa's tilt table results demonstrated vasomotor syncope, which is not cardiac-related. (Id.). Noting Larissa's high heart rate and drop in blood pressure during the tilt table test, the ALJ relied on Larissa's treating physicians who determined that Larissa's syncope

31

was being caused by POTS and not some other disorder. (Dkt. 13-2 at 19, R. 19). The ALJ also noted that Larissa's treating doctors believed that some of her symptoms were related to untreated depression and anxiety. (Id.). It is clear from reading the ALJ's decision as a whole that there is substantial evidence to support the ALJ's findings that Larissa did not meet or medically equal all the criteria of Listing 4.05.

The Undersigned finds that Larissa has not met her burden of demonstrating that her impairments alone or in combination satisfy all of the requirements of Listing 4.05. Moreover, the ALJ provided sufficient analysis to justify her negative determination, and this decision is supported by substantial evidence. Accordingly, the Undersigned recommends that the ALJ's Step Three determination be affirmed.

## B. RFC Determination

Next, Larissa argues that the ALJ failed to properly consider and weigh all the medical opinion evidence when crafting her RFC. (Dkt. 20 at 19-20). Specifically, Larissa contends that the ALJ erred in failing to acknowledge two opinions of the consultative examiner, Dr. Roland Wilson, including: (1) Larissa could not "sit or stand for more than 15 minutes and walk for no more than 5 minutes" and (2) that Larissa's stable gait was "probably not sustainable given her history." (Id. at 19-20). In response, the Commissioner argues that the ALJ sufficiently considered the results of Dr. Wilson's examination and used these results in assessing Larissa's RFC. (Dkt. 23 at 20). In addition, the Commissioner maintains that neither of the notations from Dr. Wilson's report that Larissa is

relying on to demonstrate error constitute medical opinions as defined in the Social Security Administration's regulations or case precedent. (Dkt. 23 at 20-23).

"Medical opinions" are statements from physicians, psychologists, or other "acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). ALJs are obligated to consider each of the medical opinions in the record, *see id.* § 404.1527(b) (the ALJ "will always consider the medical opinions in [the claimant's] case record . . ."), and the regulations provide several factors for determining the weight the ALJ is to afford an opinion based upon its source (*i.e.*, whether a treating doctor or only a non-examining consultant) and its supportability. *See generally Id.* § 404.1527(c). The ALJ must offer good reasons for the weight she assigns. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *9 (N.D. Ill. Feb. 29, 2016) (internal citations omitted).

Larissa visited Dr. Wilson on July 11, 2016 for a consultative examination. (Dkt. 13-7 at 28, R. 746). In the "History of Present Complaint" section ("HPI"), Dr. Wilson noted:

> Claimant states that she has postural orthostatic tachycardia, dizzy spells, and tires easily due to aches in the legs. She complains of pain in her lower back, legs, and shoulders. She cannot sit or stand for more than 15 min and walk no more than 5 min.

(Id.). Interpreting this HPI section of Dr. Wilson's report as a medical opinion, Larissa maintains that the ALJ erred in failing to consider the opinion that she

33

could only sit or stand for 15 minutes and walk for 5 minutes in an eight-hour workday when crafting her RFC. (Dkt. 20 at 19-20).

The Plaintiff overlooks that the HPI is not a portion of the treatment note where a doctor offers an objective assessment or opinion. *Snedden*, 2016 WL 792301, at *9. Rather, this section "merely reflects the patient's subjective statements about the problem for which she is seeking care and a history of that problem, if any." *Id.* (citing Peter R. Lichstein, Clinical Methods: The History, Physical, and Laboratory Examinations 32 (3d ed. 1990))*; see also Day v. Colvin*, No. 1:15-cv-1615-DKL-TWP, 2016 WL 4607446, at *3 (S.D. Ind. Sept. 6, 2016) (the HPI refers to the portion of the treatment record that captures the claimant's own subjective report to the physician about his condition). Thus, these statements in the HPI about Larissa's ability to walk and stand are her subjective complaints she made to Dr. Wilson, and not rooted in his findings on examination. Accordingly, the Undersigned does not find that this portion of Dr. Wilson's report qualifies as a medical opinion and, therefore, the ALJ did not err in failing to articulate the weight given to this subjective complaint.

On examination, Dr. Wilson found Larissa's gait to be stable and within normal limits, but cautioned that this was "probably not sustainable given her history." (Dkt. 13-7 at 31, R. 749). Dr. Wilson diagnosed Larissa with morbid obesity and chronic fatigue syndrome. (Id.). The Plaintiff maintains that the ALJ erred by failing to weigh this prognosis when crafting her RFC. (Dkt. 20 at 20). While the Undersigned agrees that this was a medical opinion that needed to be weighed, the

ALJ did not err because she considered Dr. Wilson's findings in her decision. (Dkt. 13-2 at 20, R. 20). In formulating Larissa's RFC, the ALJ noted that medical examiners had observed that Larissa, despite her weight, was able to ambulate without the need of an assistive device and retain her functional range of motion. (Id.). The ALJ, citing to Dr. Wilson's report and other medical evidence, reasoned that given Larissa's lumbar MRI which was normal; her ability to function within normal limits on physical exams; her improvements with physical therapy; and her pain which was now somewhat controlled, that Larissa was capable of performing sedentary exertion level work.

In addition to Dr. Wilson's opinion, the ALJ weighed Larissa's testimony concerning her dizziness, her POTS diagnosis, her treatment history, the objective medical evidence, and other clinical findings to assess Larissa's RFC. (Dkt. 13-2 at 16-21, R. 16-21). While the state agency medical consultants[29] found Larissa capable of walking and standing for about six hours in an eight-hour workday, the ALJ discounted these opinions and found Larissa capable of walking and standing for 30-45 minutes at a time, for a total of up to 2 hours in an eight-hour workday. (Id. at 16, 21, R. 16, 21).

Thus, even if the ALJ erred by not discussing and weighing Dr. Wilson's opinion about the prognosis of Plaintiff's ability to sustain her gait, this error was harmless. Dr. Wilson saw Larissa only on one occasion, which raises a question of

---

[29] The state agency medical consultants opined that the claimant could perform work at the light exertional level. The ALJ gave these opinions partial weight because she was concerned that these sources may not have fully considered the claimant's subjective allegations. (Dkt. 13-2 at 21, R. 21).

how Dr. Wilson could assess that Plaintiff's gait (which was normal during the examination) was "probably not sustainable." Moreover, this medical prognosis is not corroborated by any of the other medical records. In March 2016, Dr. Gleason noted that Larissa had a normal gait and no lightheadedness with brief walking. (Dkt. 13- 5 at 17-18, R. 477-478). He encouraged Larissa to engage in cardiovascular exercise, walking, and jogging and to slowly increase her amount of exercise to address her symptoms. (Id). In September and December 2017, Dr. Comer noted that Larissa's casual walking was unremarkable. (Dkt. 13-9 at 41, 45, R. 1017, 1021). He also noted that walking and exercise had improved Larissa's symptoms in the past. (Dkt. 13-9 at 40, 43, R. 1016, 1019). Given Larissa's favorable response to exercise, Dr. Comer referred Larissa to therapy; however, she decided to not go. (Dkt. 13-9 at 42, 46, R. 1018, 1022). In March 2018 and September 2018 during her follow-up visits, Dr. Comer found Larissa's gait to be normal. (Dkt. 13-13 at 23, 49, R. 1290, 1316). At the September 2018 visit, Dr. Comer noted that Larissa had not attended the pain clinic classes that he had previously referred her to because she alleged to not have time. (Dkt. 13-13 at 21, R. 1288). Lastly, the state agency consultants, who relied on Dr. Wilson's examination report, concluded that Larissa could stand and/or walk about six hours in an eight-hour workday. (Dkt. 13-2 at 76, 91, R. 76, 91). Thus, even had the ALJ specifically discussed the sole treatment note from Dr. Wilson, the ALJ would have been entitled to give it minimal or no weight.

The Undersigned finds that the ALJ sufficiently considered Dr. Wilson's assessment. Additionally, taken together, the medical and relevant nonmedical evidence provides substantial evidence that the ALJ's determination that Larissa can stand for 30-45 minutes at a time for up to 2 hours in an eight-hour workday is supported by the record.

## V.    CONCLUSION

For the reasons detailed herein, the Undersigned recommends that the ALJ's decision denying Plaintiff benefits be **AFFIRMED**.

Any objections to the Magistrate Judge's Report and Recommendation must be filed in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Failure to file objections within fourteen days after service will constitute a waiver of subsequent review absent a showing of good cause for such failure.

So RECOMMENDED.

Date: 4/19/2021

Doris L. Pryor
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email